EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

JOINT APPRENTICESHIP COMMITTEE OF the JOINT BOARD OF ELECTRICAL INDUSTRY, Defendant.

No. 84 Civ. 3373 (WK).

United States District Court, S.D. New York.

Aug. 31, 1993.

Delner Franklin–Thomas, E.E.O.C., New York City, for plaintiff.

Norman Rothfeld, New York City, for defendant.

### OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

We entertain for the second time plaintiff's motion for partial summary judgment on the issue of liability in this Equal Employment Opportunity Commission ("EEOC") action challenging defendant Joint Apprenticeship Committee's ("JAC") requirement of a high-school diploma and one-time age limit of 22 (discontinued in 1985) as having and having had a discriminatory impact, respectively, on blacks and women in violation of the Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq.

Initially, we granted summary judgment based on our finding (May 1, 1989 Memorandum and Order ("May 1 Order") at 7) that:

> the EEOC has come forward on its motion with sufficient statistical proof that the high school diploma requirement has a disparate impact on blacks, and that the former age maximum had a disparate impact on women during the years in which it was in effect. We conclude that a prima facie case of disparate impact has been made out with respect to both challenged requirements.

On appeal, however, the Court of Appeals, in an opinion reported at 895 F.2d 86, vacated our order and remanded the action for further proceedings in light of Wards Cove Packing Co. v. Atonio (1989) 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733. The Supreme Court there held that a prima facie case of disparate impact must: (i) demonstrate the relevant statistical imbalance in the workplace; (ii) identify the specific personnel practice being challenged; and (iii) demonstrate that the challenged practice caused the statistical imbalance. The Court of Appeals noted that we had apparently found it unnecessary to make the requisite finding that there existed a "causal nexus" between the high school diploma and age maximum requirements and the statistical

disparities affecting race and gender. It did not, however, express any opinion as to the sufficiency of the EEOC's statistics on disparate impact or as to whether or not the granting of summary judgment would be appropriate with respect to the issue of causation. 895 F.2d at 91. As the Civil Rights Act of 1991 left intact Wards Cove's requirement of a causal nexus, on remand the EEOC must demonstrate "that it is the application of a specific or particular employment practice that has created the disparate impact under attack." Wards Cove, 490 U.S. at 657, 109 S.Ct. at 2124.

After permitting additional discovery and submissions, we heard renewed argument on the EEOC's partial summary judgment motion. Both parties have—in addition to discussing the Wards Cove "causal nexus" issue—submitted new affidavits analyzing the issue of disparate impact. We shall therefore reconsider our determination on that issue before we consider what effect Wards Cove should have on our ultimate conclusion.

For the reasons that follow, we adhere to our original conclusion that the EEOC has made out a prima facie case of disparate impact. Indeed, despite its submission of a wealth of additional affidavits and depositions, we are still able to say—as we did at p. 4 of our May 1 Order—that the JAC has failed:

> to cast doubt on the validity of the EEOC's proffered statistics. Through the submissions of their [new papers] they have done no more than suggest several minor ways in which the EEOC's statistical analysis could have been conducted differently. In order to refute the EEOC's prima facie case, however, they must do more than poke insignificant holes in the EEOC's proof; they must show that a proper statistical analysis would "weaken the showing of a ... disparity" to a legally significant degree. Sobel v. Yeshiva University (2nd Cir.1988) 839 F.2d 18, 34.

With respect to the effects of the educational requirement upon blacks, we adhere to our original conclusion that the difference between the percentage of blacks turned

away from the programs in question compared to the percentage of whites is "statistically significant well beyond the two to three standard deviations suggested by the Supreme Court as determinative of whether a legally significant disparate impact has been shown"[1] (*Castenada v. Partida* (1977) 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498). Additionally, the percentage of blacks among the total applicants to the programs was significantly lower than the percentage of blacks in the pool of potential applicants.[2]

With respect to effects of the age maximum upon women, we are similarly persuaded that the EEOC's minimally revised statistics still demonstrate that "a significantly greater percentage of female applicants than male applicants were over the age of 22 and were thus deemed ineligible" (May 1 Order at 3). Moreover, there was a statistically significantly smaller percentage of women applicants among total applicants as compared to their percentage in the availability pool, and the proportion of overage women applicants was statistically significantly greater than the percentage of overage men. The EEOC's adjustment of the calculations submitted in the original motion does not affect these conclusions. *See* Gardinier July 1991 Aff. ¶¶ 13, 14, 16b, 17a, and 17b.

**1.** Although a JAC expert has averred that the EEOC erred in counting the number of black applicants who lacked diplomas, we are persuaded by the EEOC expert's analysis that even using the JAC figures the differences are statistically significant. *See* Gardenier July 1991 Aff. ¶ 16.

**2.** With respect this disparity, we note that the EEOC did adjust its statistics in light of JAC criticisms. However, its adjusted calculation that blacks make up 13% of applicants rather than 12.2% has no impact on the validity and significance of its statistical analysis. Additionally, the EEOC's refined "availability pool," which it adjusted in response to the JAC's contention that there is no reason to assume that all the employees subsumed by the categories of "laborers" or "operators" would equally desire to become electricians, is still 17.9% black, a figure that remains statistically significant when compared with the 13% of the applicants who were black. The JAC alternative—those blacks working toward or having obtained some kind of associate degree in engineering or related technologies (Valinsky July 1988 Aff.), a pool in

Turning to the key question on remand, whether the EEOC has demonstrated a causal nexus between the challenged practices and the statistical disparities, we are persuaded by a careful consideration of the record that the educational requirement and age maximum had a chilling effect on potential black and women applicants, which caused the above-described statistical disparities. Thus we conclude that the EEOC has carried its burden and made out a *prima facie* case of disparate impact with respect to both requirements.

There is no other satisfactory explanation for either the statistically significant disparities between blacks and women who applied and were rejected from the programs for failure to satisfy the educational and age requirements, respectively, or the significantly smaller percentage of blacks and women among the available applicant pool who in fact applied for the program. More importantly, this latter phenomenon appears to be directly attributable to JAC advertisements expressly stating that "Anyone who does not meet the age, educational or. any other requirement outlined in the notice should not request an application," and, in bold capitals, that **"ALL APPLICANTS MUST MEET THE FOLLOWING MINIMUM QUALIFICATIONS IN ORDER TO QUALIFY,"** which blacks comprise less than 7%—is entirely arbitrary and unsupported. *See also* May 1 Order note 1. The EEOC's correction of two errors regarding statistical disparities between the academic qualifications of whites and blacks—its initial exclusion of blacks who had earned a Graduate Equivalency Degree ("GED"), which caused it to overestimate the proportion of blacks accepted into in the programs who did not possess the required academic qualifications, and its use of a population with a median age of 46 to calculate the disparity between black and white high school diploma attainment—also does not affect the statistical significance of its disparity analysis. *See also* May 1 Order at 4–5 and note 2. Finally, we see no reason to adopt on remand the use of a pass ratio rather than a fail ratio when calculating the so-called "80% rule." The JAC contends that use of a pass ratio would establish that no disparity exists (Valinsky July 1990 Aff.). This calculation, however, assumes that the number of applicants to the programs is random, when, in fact, the EEOC's claim is precisely that the number of applicants was itself affected by the educational requirements. *See* Gardinier July 1991 Aff. ¶¶ 7a, 7b, 13, and 14.

with age and education being the first two qualifications listed. EEOC 3(g) Exhs. C, D, and E.

 Although the JAC points out that the EEOC has not produced a single otherwise qualified individual who was deterred by the advertisements from applying to a program, we agree with the EEOC that chilling effect generally turns upon statistical proof and not on evidence of what might have happened to specific individuals. We conclude that the combination of the statistical disparities and the advertisements' dissuasive intent satisfies *Wards Cove's* "causation" requirement. *See* 490 U.S. at 657–58, 109 S.Ct. at 2124–25; *see also Nash v. The Consolidated City of Jacksonville, Duval County* (11th Cir.1990) 905 F.2d 355, 358 (substantial disparity established by statistical evidence regarding a specific employment practice satisfies *Wards Cove's* causation requirement).

 As the Court of Appeals noted, the EEOC having made out a *prima facie* case, the JAC must "bear the burden of showing that there are 'legitimate, nondiscriminatory reasons' for the specific employment practices in question." 895 F.2d at 91 (quoting *Watson v. Fort Worth Bank and Trust* (1988) 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827). The JAC, however, is still in the position of having "done nothing at all to meet this aspect of their burden in opposing the motion" because of its "strategic decision [to place] all of their chips on their (now failed) effort to undercut the EEOC's *prima facie* case" (May 1 Order at 8).[3] Thus this action is again "in the same posture as it would be at a trial of the liability phase of the case if, after losing their motion to dismiss at

the close of plaintiff's case, defendants rested without calling any witnesses. . . . the only procedural avenue . . . is to proceed to the damages phase of the case" (May 1 Order at 8).

Accordingly, the EEOC's renewed motion for partial summary judgment on the question of liability is granted. The parties shall appear for a conference on September 20 at 4:30 p.m. to discuss what further action may be appropriate.

SO ORDERED.

---

3. On the basis of this strategic decision, we earlier struck a JAC business justification affidavit belatedly filed without permission after the record had been closed and oral argument on the summary judgment motion conducted (*see* May 1 Order at note 6). We believe this decision to be the law of the case and adhere to it. Thus we will not now permit the JAC to reopen the record on the question of business justification, and exercise our discretion to strike the May 31, 1990 affidavit of Arthur L. Helfman and the April 2, 1990 affidavit of Ernest van den Haag on the questions of the educational requirement and age maximum, respectively.

We observe in this regard that, even if we were to allow the affidavits, neither refers to any study

or scholarly work (or indeed work of any kind) to support its conclusions. We thus see no reason to believe that a person with a diploma would be capable of making mathematical computations but, for example, a person with only three years of high school study would not, or that a mentor-mentee relationship can only be created if an apprentice is 22 years old or younger, rather than, for example, 25 or younger. As such, the affidavits appear to be entirely unpersuasive. *See Wards Cove*, 490 U.S. at 658, 109 S.Ct. at 2125 (business justification phase includes consideration of "the availability of alternative practices to achieve the same business ends, with less racial impact").